UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
            v.                  )        CRIMINAL NO. 03-10387-DPW
                                )
EARL CHARLEY, JR.               )

DEFENDANT'S MOTION TO SUPPRESS FRUITS OF
ILLEGAL SEARCH AND SEIZURE AND STATEMENTS

Defendant, Earl Charley, Jr., respectfully moves that this Court suppress from evidence marijuana, a gun, and any other items allegedly observed or seized from his vehicle on September 28, 2003, as well as any statements allegedly made by him that resulted from the unlawful searches and seizures.

As grounds for this motion, Defendant states that the evidence was obtained in violation of his rights under the Fourth and Fifth Amendments to the U.S. Constitution.

Defendant further states:

1.    The police stopped his car in violation of the Fourth Amendment;

2.    The search of his car and seizure of items from the car was in violation of the Fourth Amendment and/or the items seized were the fruits of the illegal stop;

3.    The Defendant's statements to police while in custody were obtained in violation of his Fifth Amendment rights and/or the statements were the fruits of either the illegal stop or the illegal search and seizure.

STATEMENT OF FACTS

At approximately 2:00 a.m. on September 28, 2003, Officers Harber and Gately of the Boston Police received information from Detective Steven O'Brien that the Defendant, Earl Charley, Jr., and his brother, Anthony Charley, were observed at the corner of Wait Street and Huntington Avenue, accompanied by two females. Ex. A, Boston Police Incident Report at 2 (hereinafter Ex. A, BPD Report at _). Officers observed the Charley brothers and the two women get into a gray Kia Optima parked on Huntington Avenue. Id. According to the police report, the car made an "illegal u-turn" and proceeded in the opposite direction on Huntington Avenue. Id. The officers followed the car and stopped it on Tremont Street. Id. The report mentions no basis for the stop other than the "illegal u-turn." Id.[1]

When Officer Gately asked the Defendant "for his license and registration, he observed, through his training and on the job experience a strong pungent odor emanating from the driver [sic] side believed to be unburned marijuana." Ex. A, BPD Report at 2. The officer then asked Defendant Charley to get out of the car at which point he recovered eight clear plastic bags of green vegetable matter in the center console. Id. A later test

---

[1] Upon approaching the vehicle, the officers noted that three of the occupants, including Charley in the driver's seat, were not wearing seatbelts. However, the police made this observation after, not before, the stop. Ex. A, BPD Report at 2.

determined the vegetable matter to be marijuana.  Ex. B, Drug Lab
Results.  Charley was then placed under arrest, and the
passengers were asked to exit the vehicle.  Ex. A, BPD Report at
2.  The police also issued Charley a citation for the "illegal
u-turn."  Ex. C, Citation.

The officers then conducted a search of the car.  They found
a black Hi-Point Model C 9 mm semiautomatic handgun in the glove
compartment along with a piece of mail addressed to Charley.  Ex.
A, BPD Report at 2.

Defendant Charley and the three passengers were taken to the
police station.  Charley was given his Miranda warnings followed
by an interview with Detective O'Brien.[2]  During this interview,
Detective O'Brien repeatedly told Charley that if he admitted the
firearm found in the vehicle belonged to him, the other occupants
of the vehicle would not be charged and would be released.  Ex.
D, Transcript of Charley Interview.  After stating, "Let's just
get this over with, get them out of here."  Ex. D, Transcript of
Charley Interview at 8, Charley then stated that the gun belonged
to him.  Id. at 10-12.

---

[2]  The police stopped Charley's car at approximately 2:00
a.m.  Ex. A, BPD Report.  At 3:07 a.m he signed a Miranda waiver
form.  Ex. E, Miranda Waiver Form.  At 3:09 a.m. he signed a
written waiver of prompt arraignment which included an
acknowledgment that he had been informed of his Miranda rights.
Ex. F, Waiver of Prompt Arraignment Form.  At 3:43 he was booked.
Ex. G, BPD Booking Sheet.  At 3:44 the police begin interrogating
the passengers in Charley's car.  Ex. H, Miranda Warning for
Anthony Charley.

ARGUMENTS

I.   THE POLICE LACKED PROBABLE CAUSE TO STOP THE DEFENDANT
     BECAUSE NO TRAFFIC VIOLATION OCCURRED.

     The police assert Charley made an illegal u-turn on
Huntington Avenue, however, u-turns are legal in that location.
In any event, there is also a dispute as to whether Charley made
a u-turn.

     A.   U-turns Are Legal On Huntington Avenue.

     The Fourth Amendment requires police to have probable cause
to believe a traffic violation has occurred before stopping a
vehicle.  Whren v. United States, 517 U.S. 806, 806 (1996);
United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997)
(citing Whren for proposition that probable cause is required for
traffic stops).

     The officers who stopped Defendant Charley's vehicle relied
on an alleged illegal u-turn made by Charley as grounds to
establish the requisite probable cause.  According to 720 CMR
9.06(26) (2003)(copy attached as Exhibit I), however, u-turns are
only prohibited "wherever signs notifying of such a restriction
have been erected."  Furthermore, the Traffic Rules and
Regulations of the City of Boston, Section 14, (excerpt attached
as Exhibit J) reiterate that a u-turn is prohibited only "by an
official traffic sign, signal, marking or other device, erected
and maintained, or caused to be made, erected and maintained by
the Commissioner of Transportation."

-4-

According to the police report, Charley, at the intersection of Wait Street and Huntington Avenue made an "illegal u-turn" to head inbound. Ex. A, BPD Report at 2. There are no signs, however, prohibiting u-turns on that portion of Huntington Avenue. Ex. K, Affidavit of Winfred Meadows. Therefore, the officers lacked the requisite probable cause to stop his car and they violated the Fourth Amendment. See Wren, 517 U.S. at 806. Because the stop was unlawful, any evidence seized thereafter must be suppressed as fruits of an illegal search including the marijuana, the gun and Charley's subsequent statement. United States v. Calandra, 414 U.S. 338, 347 (1974).

　　　　　B.　　Even if the court finds that a u-turn on Huntington Avenue is illegal, the defendant did not make a u-turn.

　　　　　Charley maintained in his post-arrest interview with Detective O'Brien that he did not make a u-turn on Huntington Avenue prior to being stopped by the Boston Police. Ex. D, Transcript of Charley's Post-Arrest Statement at 9. Therefore, the police lacked probable cause to stop his car. See Wren, 517 U.S. at 806, and any evidence obtained following that unconstitutional stop must be suppressed as fruits of an illegal search including the marijuana, the gun and Charley's subsequent statement. Calandra, 414 U.S. at 347.

ıI.   THE POLICE LACKED PROBABLE CAUSE OR REASONABLE SUSPICION TO
      SEARCH THE DEFENDANT'S CAR.

      Before conducting a search of a vehicle, police officers
ordinarily must have probable cause to suspect criminal activity
under the Fourth Amendment.  <u>Chambers v. Maroney</u>, 399 U.S. 42,
48-51 (1970).  The police had no such cause.

      According to the police report, the one police officer that
approached Charley's stopped vehicle claimed he smelled pungent
unburned marijuana from inside the vehicle.  Facially, this
assertion is incredible.

      The amount of marijuana retrieved from the car was small:
eight small ziplock style jewelry bags which together would fit
inside a sandwich bag.  Ex. A, BPD Police Report at 2.

      Passengers in the car smelled no marijuana.  Andrea Walker,
one of the female passengers in the car, stated during
interrogation as follows:

      Det. O'Brien:  Did you ever smell marijuana in the car?

      Walker:        No, did you?

      Det. O'Brien:  I wasn't there.

      Walker:        Oh.

      Det. O'Brien:  You'd have to ask him.

      Ms. Walker:    You were.  You didn't smell nothing in that
                     damm car.

-6-

Det. O'Brien:  Well that's ___ I don't want to go into it
                what actually happened to him.

Ex. L, Walker Interview at 9.

Similarly, Cicely Langford, a passenger in the car, told the police she did not smell anything.  Ex. M, Langford Interview at 9.

Air fresheners present in the car masked any marijuana smell.  The day after Charley's arrest his sister Renata Charley retrieved Charley's car from police custody.  Ex. N, Affidavit of Renata Charley.  She found two air fresheners in his car.  Id. Both air fresheners smelled.  Id.  One air freshener was the Christmas Tree style; it was hanging from the rear view mirror. Id.  The other air freshener was a rectangular block.  Id.  It was on the floor of the driver's side area.  Id.[3]  These air fresheners are designed to mask smells and are effective in doing so according to Harry Lawless, Ph.D.  Ex. O, Affidavit of Harry Lawless at ¶ 5.  Dr. Lawless is an expert in the function of human senses including the sense of smell.  Id. at ¶ 2.  He is a Professor of Food Science at Cornell University.  Id. at ¶ 1.  He

---

[3]  Charley's sister has retained both of the air fresheners. Ex. N, Affidavit of Renata Charley at ¶ 4.

based this opinion on, among other things, his examination of
Charley's car and the air fresheners.  Id. at ¶ 4.

In the face of these facts, the police officer's assertion
that he could detect a strong pungent odor from outside the
vehicle is not believable.  Thus, the search of the car violated
the Fourth Amendment, requiring suppression of evidence seized
there from as fruits of an illegal search and the subsequent
statement also as a fruit of the illegal search.  United States
v. Calandra, 414 U.S. 338, 347 (1974).

III.  ANY STATEMENTS MADE BY THE DEFENDANT REGARDING THE GUN WHILE
      IN CUSTODY WERE INVOLUNTARY AND INADMISSIBLE BECAUSE THEY
      WERE COERCED AND BECAUSE THEY WERE FRUITS OF AN ILLEGAL
      SEARCH.

Pursuant to the Fifth Amendment, confessions that are
obtained through physical or psychological coercion are
involuntary, and convictions obtained through admission into
evidence of such confessions cannot stand, regardless of the
truthfulness of the confession.  Rogers v. Richmond, 365 U.S.
534, 541 (1961) (finding coercion where prisoner confessed under
threat that his wife would be brought in for questioning).
Confessions are free and voluntary if 1) not extracted by any
threats or violence; 2) not obtained by any direct or implied
promises, no matter how slight; and 3) not obtained through
improper influence.  Bram v. United States, 168 U.S. 532, 542-43
(1897).  In order to determine whether the will of the accused
was overborne, courts must look to the totality of the

-8-

circumstances, including promises or threats by police officers.
United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990). The
Fourth Amendment also precludes admission of confessions obtained
as fruits of an illegal search and seizure. Oregon v. Elstad,
470 U.S. 298, 306 (1985) ([w]here a Fourth Amendment violation
taints the confession, a finding of voluntariness . . . is merely
a threshold requirement . . . . [T]he prosecution must show a
sufficient break in events to undermine the inference that the
confession was caused by the Fourth Amendment violation.).

When Detective O'Brien interviewed Defendant Charley in
custody following his arrest, he encouraged him to claim the gun
belonged to him by repeatedly mentioning a deal. The terms of
the deal were that if Charley stated the gun was his, the police
would not press charges against his brother and two female
friends. Charley and O'Brien discussed the deal openly
throughout the interview, Charley seeking to clarify its terms
and the detective reiterating them. Almost immediately before
acknowledging possession of the gun, Charley stated, "Let's just
get this over with and get them out of here." Charley's repeated
references to the deal throughout the interview clearly
demonstrate the coercion exerted upon him by the interviewing
officer. Charley's statements while in custody, therefore, were
involuntary and should be suppressed pursuant to the Fifth
Amendment. See Rogers, 365 U.S. at 541. Even if the statements

-9-

were voluntary, however, the Fourth Amendment still prohibits their admission into evidence because they were tainted by the earlier Fourth Amendment violations. <u>See</u> <u>Elstad</u>, 470 U.S. at 306.

REQUEST FOR EVIDENTIARY HEARING

Defendant requests an evidentiary hearing on this motion.

CONCLUSION

For the foregoing reasons, the Defendant respectfully requests that the Court grants this motion and suppress the evidence seized as well as Charley's statement.

EARL CHARLEY
By his attorney,


/s/ Leo T. Sorokin
  B.B.O. #559702
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

<u>CERTIFICATE OF SERVICE</u>

I, Leo T. Sorokin, hereby certify that a true copy of the above document was served on Assistant U.S. Attorney Chris Bator on June 10, 2004.


Leo T. Sorokin

<u>EXHIBITS</u>

A - BPD Report

B - Drug Lab Test Results

C - Traffic Citation

D - Transcript of Charley Interview

E - Miranda Waiver Form

F - Waiver Prompt Arraignment

G - BPD Booking Sheet

H - Anthony Charley Miranda Waiver

I - 720 CMR 9.06(26) (2003)

J - City of Boston Traffic Rules and Regulations, Section 14

K - Affidavit Winfred Meadows

L - Transcript of Walker Interrogation

M - Transcript of Langford Interrogation

N - Affidavit Renata Charley

O - Affidavit Harry Lawless, Ph.D.