```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
           V.               ) CRIMINAL NO. 03-10387-DPW
                            )
EARL CHARLEY, JR.           )
```

## OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States opposes the Motion To Suppress of defendant Earl Charley, Jr. ("Charley").

### Relevant Facts

At approximately 2:00 a.m. on September 28, 2003, Boston Police Officers Edward Gately and Jon-Michael Harber, while on-duty in their police cruiser near Flanagan's restaurant on Huntington Avenue in Boston, saw the defendant, Earl Charley, accompanied by three other individuals, cross Huntington Avenue (to the side opposite Flanagan's restaurant) and enter a grey KIA Optima automobile parked next to the curb.  Officers Gately and Harber saw the KIA make an illegal u-turn, crossing two lanes of traffic and a double-yellow line from the parked position, and drive in the direction of Tremont Street.  (Huntington Avenue at this location has a double-yellow center line with three lanes on each side-two for traffic and one next to the curb for parking). Officers Gately and Harber followed the KIA and saw it turn right onto Tremont Street where they pulled the KIA over.  Affidavit of Edward Gately ("Gately Affidavit"), attached as Exhibit 1, at p. 1.

After stopping the KIA, Officer Gately approached the driver's side of the KIA and, through the open window, asked Charley, who was sitting in the driver's seat, for his license and registration.  At approximately the same time, Officer Gately smelled a strong odor coming from the driver's side of the car that he recognized, based on his experience and training, to be marijuana.  Officer Gately asked Charley to get out of the car. After Charley got out of the car, Officer Gately, following the smell, and contrary to his usual practice when searching a car, immediately searched the front center console and recovered eight clear, plastic bags containing what Officer Gately recognized as marijuana.[1]  (Officer Gately's usual practice when searching a car is, other things equal, to first search under the car seats.) Gately Affidavit at p. 2.

After the marijuana was found, Charley was placed under arrest and the three other individuals in the KIA automobile, Anthony Charley (Earl Charley's brother), Andrea Walker and Cicely Langford were asked to get out of the car.  After they got out of the car, Officer Gately and Boston Police Officer Steven Canto, who had arrived at the scene with other Boston Police Officers, searched the car.  Inside the glove compartment, Officer Canto found a black, Hi-Point Model C 9mm semiautomatic

---

[1] Laboratory tests have confirmed that the plastic bags contain marijuana.

handgun containing eight rounds of 9 mm ammunition and one piece of mail addressed to Earl Charley. The serial number of the handgun was completely obliterated. Gately Affidavit at p. 2.

Shortly following Charley's arrest, he and Anthony Charley, Andrea Walker and Cicely Langford were each separately interviewed by police. The interviews were audiotaped. At the beginning of each interview, they were each given Miranda warnings and each signed a Boston Police Department Miranda Warning form.

At the beginning of Charley's interview, Boston Police Detective Stephen O'Brien, who was conducting the interview, told Charley "we want the truth." In response to Charley's inquiry concerning whether the others in the car would be charged if the gun were his, O'Brien told Charley "we have to know what the truth is." He further cautioned Charley not to lie to protect the other persons who were in the car. During the interview, Detective O'Brien repeatedly told Charley to tell the truth and reminded him several times that he was under no obligation to speak, and could stop the interview and wait for a lawyer. Transcript of Interview of Earl Charley ("Charley Transcript") attached as Exhibit 2, at pp. 1-21.

During the interview, Charley stated that the gun and the marijuana belonged to him. Charley Transcript at pp. 10, 18. Although he knew his car had been stopped for making a u-turn,

Charley repeatedly denied that he made a u-turn and that his car had been parked facing in the opposite direction from where he was arrested. Id. at 9-10, 14-15. He stated several times that he was not lying and that he was telling the truth. Id. at 17-18, 20.

Charley had been arrested before. Id. at 7. During the interview he specifically asked for a "Bail Bondsman". Id. at 8. Prior to his arrest, and beginning in 1981, he had many interactions with law enforcement officers. See Exhibit 3, attached.

During her interview, Cicely Langford stated that the KIA automobile driven by Charley, and in which she was a passenger, had been parked on the opposite side of Huntington Avenue from Flanagan's restaurant and made a u-turn on Huntington Avenue in the direction of Tremont Street. Transcript of Langford Interview ("Langford Transcript"), attached as Exhibit 4, at pp. 10, 12-13.

During her interview, Andrea Walker stated that the KIA automobile driven by Earl Charley, and in which she was a passenger, had been parked on the opposite side of Huntington Avenue from Flanagan's restaurant, reversed direction on Huntington Avenue, and was stopped by the police on Tremont Street. Transcript of Interview of Andrea Walker ("Walker Transcript"), attached as Exhibit 5, at pp. 5-8, 11-12.

During his interview, Anthony Charley testified that the KIA automobile was parked on Huntington Avenue on the side of the street opposite from Flanagan's restaurant. Transcript of Interview of Anthony Charley ("Anthony Transcript"), attached as Exhibit 6 at pp. 6-7, 13.

ARGUMENT

I. <u>The Police Lawfully Stopped Charley's Car</u>

A police officer's "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996); <u>United States v. Bizier</u>, 111 F.3d 214, 217 (1st Cir. 1997.) Here Officers Gately and Harber stopped Charley's car after seeing him make an illegal u-turn. Gately Affidavit at p. 1.

Contrary to Charley's assertion, the u-turn he made on Huntington Avenue, and which was seen by Officers Gately and Harber, was illegal. Mass. Gen. Laws ch. 90 §14 states:

> When approaching for a left turn on a two-way street, an operator shall do so in the lane of traffic to the right of and nearest to the center of the roadway and the left turn shall be made by passing to the right of the center line of the entering way where it enters the intersection from his left.

Similarly, the Massachusetts Registry of Motor Vehicles Online Driver's Manual (attached as Exhibit 7) states:

> "You may only make a u-turn from

5

the lane closest to the center line."

See Exhibit 7 at p. 100.

Here, Officers Gately and Harber saw Charley make a u-turn from a parking spot next to the curb (in the far right lane) on Huntington Avenue, crossing two lanes of traffic. Gately Affidavit at p. 1. Charley's car was not in the left-hand lane of Huntington Avenue ("the lane closest to the center lane") when he made the u-turn. Id. Consequently, the u-turn was illegal.

Also contrary to Charley's assertion (see his motion at p. 5), he did make a u-turn on Huntington Avenue before being stopped by police. Gately and Harber saw Charley make the u-turn. Gately Affidavit at p. 1. Cicely Langford, a passenger in Charley's car, saw him make the u-turn. Langford Transcript at p. 12. Langford, Andrea Walker and Anthony Charley (the other passengers in Charley's car) each told police that after leaving Flanagan's restaurant, they crossed Huntington Avenue to get to Charley's parked car (thereby requiring that the car turn around and travel in the opposite direction before being stopped, by police, on Tremont Street.) Langford Transcript at pp. 10, 12-13; Walker Transcript at pp. 5-8, 11-12; Anthony Transcript at pp. 6-7, 13. Andrea Walker also told police that the car reversed direction on Huntington Avenue. Id. Charley's assertion that he was parked on the side of the street where Flanagan's Restaurant is located (facing in the direction

6

of Tremont Street) and did not make a u-turn (see Charley Transcript at pp. 9-10) is contradicted by all the evidence and is not credible.

## II. There Was Probable Cause To Search Charley's Vehicle

"[W]hen a law enforcement officer detects the odor of marijuana emanating from a confined area, such as the passenger compartment of a motor vehicle, that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." United States v. Staula, 80 F.3d 596, 602 (1st Cir. 1996), citing United States v. Johns, 469 U.S. 478, 482 (1985). Here, Officer Gately smelled a strong odor coming from the driver's side of the car that he recognized, based on his training and experience, as marijuana. Gately Affidavit at p. 2. That provided Officer Gately grounds to search Charley's car. Id.

It is not surprising that, following Charley's arrest, the other passengers in Charley's car denied to police that they could smell the marijuana in the car. To do otherwise would have put them in the position of knowingly and willingly being in the presence of illegal narcotics. It would also have required them to provide evidence, and perhaps be a witness, against their friend (and in the case of Anthony Charley, his own brother).

It is also significant that Officer Gately has extensive familiarity with marijuana. Gately Affidavit at p. 1. See

United States v. Pagan, 395 Supp. 1052, 1060, (D. Puerto Rico 1975) and cases cited (experience of police officer in narcotics is important factor in assessing probable cause where defendants challenge ability of agent to detect odor of marijuana emanating from van).  Moreover, the marijuana smell led Officer Gately immediately and directly to the center console of the car where the marijuana was, in fact, located and caused him to alter his usual practice when searching a car of first searching under the seats.  Id.

III.  Charley's Post-Arrest Statements Were Voluntary

"Only confessions procured by coercive official tactics should be excluded as involuntary."  United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002); United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998) citing Colorado v. Connelly, 479 U.S. 157, 167 (1986).  The voluntariness of an admission depends on "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances."  United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990); Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986).

Any fair reading of the transcript (or listening to the tape recording) of the interview with Charley establishes that his

statement that the gun[2] belonged to him was not "procured by coercive official tactics." Genao, 281 F.3d at 310. No undue or unusual pressure was applied. No threats of violence or retaliation were made. Id. The atmosphere of the interview was plainly "benign". Byram, 145 F.3d at 408. Specifically, Charley was carefully informed of his rights. He was repeatedly told to tell the truth and not to lie to protect the other persons in the car. Charley Transcript at pp. 1-21. In response to Charley's inquiry whether the others would be charged if the gun was his, Boston Police Detective O'Brien told him:

> I don't want you to say, the only reason I said it was my firearm was to get the other three people off. If it's your firearm, it's yours. If it's not, if it's your sisters or Anthony's or whatever, I don't want you to lie."

Id. at p. 3.

Further indication that Charley's will was not overborne is that he persistently denied that he made a u-turn, and that his car was parked across the street from Flanagan's restaurant facing in the opposite direction from where he was arrested (necessitating the u-turn), despite overwhelming contrary evidence. Charley Transcript at pp. 9-10, 14-15. Moreover Charley's extensive criminal record (see Exhibit 3) strongly suggests that he is, in fact, experienced and sophisticated in

---

[2] Charley does not assert that his statement that the marijuana belonged to him was involuntary.

...
dealing with law enforcement and, therefore, unlikely to have his will overborne. (See, for example, his request during the interview for a "bail bondsman." Charley Transcript at p. 8.) Consequently, Charley's claim that his statements were involuntary is without merit.

Conclusion

For the foregoing reasons, Charley's motion should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/CHRISTOPHER F. BATOR
    Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I, CHRISTOPHER F. BATOR, certify that I have served a copy of the above upon Leo T. Sorokin, Esq., Federal Defender Office, 408 Atlantic Avenue, 3rd Floor, Boston, MA 02110 by e-file notice and first class mail.

/s/CHRISTOPHER F. BATOR
Assistant U.S. Attorney

Date: July 7, 2004

Case 1:03-cr-10387-DPW    Document 21-3    Filed 07/07/2004    Page 11 of 11