UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,      )
      Plaintiff,               )
                               )        CRIMINAL NO.
            v.                 )        03-10387-DPW
                               )
EARL CHARLEY, JR.,             )
      Defendant.               )
```

MEMORANDUM AND ORDER
December 9, 2004

Defendant Earl Charley, Jr., who is accused of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), moves to suppress evidence -- including a gun, eight small bags of marijuana, and his post-arrest statements to the police -- obtained from searches he argues violated his Fourth and Fifth Amendment rights.

Charley alleges:

(a)  that the police did not have probable cause to stop his vehicle for a traffic violation (an illegal U-turn) because he did not, in fact, perform an illegal U-turn;

(b)  that the police lacked probable cause or reasonable suspicion to search his vehicle after making the initial stop, because the police officer's contention that he could detect the smell of unburnt marijuana emanating from the center console between the front seats of the defendant's car is not credible; and

-1-

(c)  that all statements made by the defendant while in
police custody should be suppressed because they were obtained by
coercion and therefore are involuntary or, even if voluntary,
because they were the fruits of the earlier Fourth Amendment-
violating stop, search, and seizure.

Following an evidentiary hearing, and for the reasons set
forth more fully below, I reject these claims.  Accordingly, the
defendant's motion to suppress will be denied.

## I. BACKGROUND

### A.  Findings of Fact

After an evidentiary hearing, I make the following findings
of fact.  At approximately 2:00 a.m. on September 28, 2003,
Boston Police Department ("BPD") Officers Edward Gately and Jon-
Michael Harber were on-duty, sitting parked in their patrol
cruiser on Huntington Avenue near Pat Flanagan's Restaurant in
the Mission Hill neighborhood of Boston.  BPD Detective Stephen
O'Brien, who was working a paid detail at Flanagan's that
evening, approached Harber and Gately's cruiser and pointed out
Anthony Charley, with whom O'Brien reported he was familiar from
a prior case involving a shooting, and his brother, Earl Charley,
Jr., as they were leaving Flanagan's.  The officers observed the
Charley brothers and the two women accompanying them, who were
later identified as Cicely Langford and Andrea Walker, cross
Huntington Avenue and get into a gray Kia Optima automobile.  The
car was parked in the parking lane on the opposite side of
Huntington Avenue, just east of the intersection with St. Albans

Road, pointing away from downtown Boston (i.e., in the direction of traffic on that side of Huntington Avenue).  The officers observed the car execute a U-turn -- thereby reversing direction on Huntington Avenue by crossing two lanes of traffic and the double-yellow line running down the middle of the street -- and proceed towards downtown Boston on Huntington Avenue.  The officers followed the Kia in their cruiser and, after the Kia turned right onto Tremont Street, pulled it over for the illegal U-turn made on Huntington Avenue.

The officers approached the Kia and Officer Gately, who was on the driver's side of the vehicle, asked Earl Charley, Jr. ("Charley"), the driver of the car, for his license and registration.  As Charley reached over into the glove compartment located in front of the passenger seat to retrieve the requested documents, Officer Gately leaned over towards the interior of the car and detected the smell of unburnt marijuana coming from inside the car.  Officer Gately asked Charley to get out of the car, pat-frisked him to determine that he was not armed, which he was not, and delivered him to another officer, who moved him around to the rear of the car.  Returning his attention to the front of the passenger compartment where he initially had detected the odor of marijuana, Officer Gately pinpointed the origin of the smell to the center console between the two front seats.  Departing from his customary car-search practice of removing all passengers from the car, patting them down, searching under the seats for weapons or other items that might

be used to inflict harm, and only then conducting a thorough
search of the car interior, Officer Gately immediately searched
the center console of the Kia and there found eight clear plastic
jewelry bags containing a leafy green substance that appeared and
was later confirmed to be marijuana.

Following the discovery and seizure of the marijuana,
Officer Gately asked the three remaining passengers to get out of
the car and, after they did so, searched the rest of the interior
of the car with Steven Canto, one of the two additional BPD
officers who had by then arrived on the scene.  During this
search, Officer Canto discovered a gun -- a black, Hi-Point Model
C 9mm semiautomatic handgun with an obliterated serial number and
loaded with eight rounds of ammunition -- as well as a piece of
mail addressed to Charley, in the glove compartment.

The officers arrested all four occupants of the Kia and took
them to the Area B2 BPD station, where they read them their
Miranda rights and interviewed them.  Charley was interviewed by
Detective O'Brien, who apparently returned to the station house
after the conclusion of his detail at Flanagan's.  During his
interview with Detective O'Brien, which included exchanges
regarding whether the three passengers in the car should not be
charged with a crime or crimes and therefore released, Charley
acknowledged that the gun found in the car belonged to him.

## B. Procedural History

An agent of the Bureau of Alcohol, Tobacco, and Firearms
swore out a federal complaint against Charley on November 21,

-4-

2003, alleging that Charley was a felon in possession of a
firearm in and affecting commerce in violation of 18 U.S.C. §
922(g)(1); that he possessed a firearm with an obliterated serial
number in violation of 18 U.S.C. § 922(k); and that he possessed
marijuana with intent to distribute it in violation of 21 U.S.C.
§ 841(a)(1).  On December 17, 2003, a grand jury indicted Charley
on the first charge only.

On June 10, 2004, Charley moved to suppress from evidence
the marijuana, the gun, and any other fruits of the search of his
car, as well as the statements he made while in police custody,
on the grounds that the police lacked probable cause for the
initial traffic stop, lacked probable cause or reasonable
suspicion for the subsequent search of his car, and obtained his
post-arrest statements through coercion, thereby rendering them
involuntary and inadmissible.

An evidentiary hearing was held on the motion to suppress,
during which Officer Gately, Renita Charley (Charley's sister),
Andrea Walker, Harry T. Lawless (Charley's expert witness
regarding sense of smell and the identification of particular
odors), and Cicely Langford testified.  Additional briefing and
final argument was conducted thereafter.

## II. DISCUSSION

Charley alleges that the police violated his Fourth and
Fifth Amendment rights at three separate points in time as
follows: (1) the initial traffic stop itself was
unconstitutional; (2) that even assuming the validity of the

initial stop, the subsequent search of and seizure from Charley's car was unconstitutional; and (3) Charley's post-arrest statements were unconstitutionally obtained.  I will consider these arguments in turn.

## A.    Traffic Stop

Charley's first line of argument is that the police lacked probable cause to suspect he had committed a traffic violation and, therefore, were unjustified in stopping his car.  Charley relies on two alternative theories to advance this argument, maintaining either that making a U-turn where he did on Huntington Avenue was permissible, given the absence of signs at that location specifically prohibiting such turns, or that he -- as he maintained during his post-arrest interview -- did not make a U-turn at all but was already on the same side of Huntington Avenue as Flanagan's (i.e., pointing towards downtown Boston).  I accept neither of these lines of argument.

It is well-established that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996); see also United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (citing Whren for the proposition that when police have "probable cause to believe a traffic violation has occurred, it is reasonable for them to stop an automobile and temporarily detain the driver").  Here, the police observed Charley's car, which was parked in the parking lane on one side of Huntington Avenue, turn left across two lanes

of traffic and a double-yellow line so as to wind up traveling in the opposite direction on Huntington Avenue.  The observations of the police regarding the U-turn were confirmed by passenger Cecily Langford, who stated in her police interview that Charley made such a turn to reverse directions on Huntington Avenue.

Relying on 720 CMR 9.06(26)[1] and City of Boston Traffic Rules and Regulations Section 14,[2] Charley argues that because at the location on Huntington Avenue where he allegedly executed the U-turn there are no posted signs specifically prohibiting U-turns, the turn he made was a legal one.  In advancing this argument, though, Charley too narrowly defines the universe of illegal "U-turns," failing to consider turns that are illegal not because of the shape described by their path (i.e., a U), but because they violate the traffic laws in some other fashion.

The government does not contest Charley's claim that there are no signs posted at the subject location on Huntington Avenue prohibiting U-turns.  Instead, it maintains that when reversing

-----

[1]
> (26) U Turns Prohibited -- No operator shall back or turn a vehicle so as to proceed in a direction opposite to that in which said vehicle is headed or traveling wherever signs notifying of such a restriction have been erected.

720 CMR 9.06(26) (2004).

[2]
> Section 14. U Turns Prohibited -- No driver shall make a U turn, where prohibited by an official traffic sign, signal, marking or other device, erected and maintained, or caused to be made, erected and maintained by the Commissioner of Transportation.

Traffic Rules and Regulations City of Boston (November 1, 2003).

direction on Huntington Avenue, Charley started his turn from the parking lane on one side of the street, continued it across two lanes of traffic and a double yellow line -- thereby violating Mass. Gen Laws ch. 90, s. 14[3] – and wound up heading in the opposite direction on the other side of the street. I credit the testimony by Officer Gately that from the parking lane on the far right side of Huntington Avenue pointing away from downtown Boston, Charley's car turned left across two lanes of traffic and the double yellow line running down the center of Huntington Avenue, and then continued on towards downtown Boston on the other side of Huntington Avenue.

I do not accept Charley's contention that he was already parked on the side of Huntington Avenue pointed towards downtown Boston, and therefore did not execute a turn at all. In addition to Officer Gately's testimony regarding the side of the street on which Charley was parked, all three passengers in the car -- Anthony Charley, Cecily Langford, and Andrea Walker -- informed the police that they needed to cross Huntington Avenue after

---

[3]

> When approaching for a left turn on a two-way street, an operator shall do so in the lane of traffic to the right of and nearest to the center line of the roadway and the left turn shall be made by passing to the right of the center line of the entering way where it enters the intersection from his left.

Mass. Gen. Laws ch. 90, s. 14. As further support, the government also cites the Massachusetts Registry of Motor Vehicles Online Driver's Manual, which states that: "You may only make a U-turn from the lane closest to the center line." Id. at page 100.

-8-

leaving Flanagan's in order to get to Charley's car.  Langford, in fact, stated that Charley made a U-turn on Huntington Avenue. Charley's assertion that he was already parked on the side of Huntington Avenue pointing towards downtown Boston cannot stand up to the weight of the evidence to the contrary.

Based on Officer Gately's testimony regarding his on-the-scene observations, and the absence of any competent evidence rebutting these observations, I find that the police had a good faith basis for believing that Charley had committed a traffic violation.  As a result, I conclude that the initial stop of Charley's car was constitutional.[4]

**B.    Car Search**

The police expanded their initial, temporary detention of

---

[4]Although unmentioned by Charley in his memoranda, the manner in which Charley caught the attention of Officers Gately and Harber illustrates the collateral effect of <u>Whren</u> in permitting the police to focus on an individual before identifying a crime.  Had Detective O'Brien, while in the course of his paid detail at Flanagan's, not alerted Officers Gately and Harber that Anthony Charley -- a person whom he had previously arrested for a serious and dangerous crime -- and his brother Earl were then leaving the premises, it is unlikely the officers would have monitored so closely the activity of a car parked more than a block ahead of them on the opposite side of the street. However, under the <u>Whren</u> rubric, the officers' subjective intent -- perhaps, hypothetically, their desire to follow these persons of interest until some pretext arose for stopping and searching them for weapons, drugs, etc. -- is of no moment so long as their behavior was objectively justifiable, as it was here when the officers pulled the car over after personally observing the driver commit a traffic violation.  In other words, the "'fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (quoting <u>Scott v. United States</u>, 436 U.S. 128, 136 (1978)).

Charley related to the traffic violation into a full-scale search of his car after Officer Gately claimed he detected the odor of unburnt marijuana coming from inside the front passenger compartment.  In the course of the subsequent search, the police discovered eight clear plastic jewelry bags containing marijuana in the center console between the front seats and a loaded 9mm semiautomatic gun with an obliterated serial number in the glove compartment.  Charley argues that Officer Gately's contention he smelled the unburnt marijuana is "incredible," that the police therefore lacked probable cause to suspect criminal activity in Charley's car, and, as a result, that the search of the car and the seizure of contents therefrom was unconstitutional.  Although Officer Gately's testimony regarding his sensory predicate for the search raised a dispositive factual dispute, for the reasons discussed below I find that he did smell the unburnt marijuana and therefore had probable cause to suspect criminal activity and conduct a warrantless search of Charley's car.

In setting forth those discrete circumstances in which the police may conduct a search without first obtaining a warrant, the Supreme Court has made particular allowances for searches of cars in light of the concern regarding their being moved before a warrant could be obtained.  In <u>Chambers v. Maroney</u>, 399 U.S. 42 (1970), the Court reviewed and reiterated its position regarding the warrantless search of cars:

> [A]utomobiles . . . may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is

probable cause to believe that the car contains articles
that the officers are entitled to seize.

Id. at 48.  "Under the 'automobile exception,' the only essential
predicate for a valid warrantless search of a motor vehicle by
law enforcement officers is 'probable cause to believe that the
[vehicle] contains contraband or other evidence of criminal
activity.'"  United States v. McCoy, 977 F.2d 706, 710 (1st Cir.
1992) (internal citations omitted) (alteration in original); see
also Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (holding
that when "probable cause exists to believe [a vehicle] contains
contraband, the Fourth Amendment thus permits police to search
the vehicle without more").  Clearly such probable cause can be
supplied by visual observations -- for example, spotting
contraband in the interior of the vehicle, as was the case in
Whren when the police pulled a car over for a traffic violation
and observed that the front-seat passenger was holding two large
plastic bags that appeared to contain crack cocaine.  Id., 517
U.S. at 809.  Olfactory observations also may provide the
"essential predicate" for a warrantless search.  The First
Circuit has held that "when a law enforcement officer detects the
odor of marijuana emanating from a confined area, such as the
passenger compartment of a motor vehicle, that olfactory evidence
furnishes the officer with probable cause to conduct a search of
the confined area."  United States v. Staula, 80 F.3d 596, 602-03
(1st Cir. 1996) (citing, among other cases, United States v.
Johns, 469 U.S. 478, 482 (1985), in holding that after a police

-11-

officer detected the odor of burnt marijuana when he approached a truck he had pulled over for a traffic violation, he had "a right to search the entire passenger compartment of the pickup truck").

Charley does not dispute the legal proposition that the odor of marijuana -- burnt or unburnt -- may provide probable cause to conduct a warrantless search of an automobile.  Rather, Charley argues that given the small quantity of marijuana involved here and the other competing odors in his car -- primarily, the scent of the two air fresheners he had placed in the car (one hanging from the rearview mirror and the other placed on the floor near the driver's seat), but also the "new car smell" of the car, the odor of the partially filled bottle and empty can of beer his sister found in the car when she recovered it from the police the day he was arrested, and the normal human body odor of the four occupants of the car -- Officer Gately could not possibly have smelled the marijuana prior to conducting his search.  In advancing this argument, Charley relies on both the denials by his three passengers that there was a perceptible odor of marijuana in the car and the affidavit testimony of Dr. Henry Lawless, Ph.D. -- his expert witness on "the function of human senses including the sense of smell" -- regarding the effectiveness of air fresheners in masking smells.

In effect, Charley seeks a finding of fact that Officer Gately was in error when he said he detected the odor of marijuana before undertaking the search of Charley's vehicle. Although several aspects of Officer Gately's testimony give cause

-12-

for closer scrutiny -- his initial response while under direct
examination during the August 11, 2004 hearing that he thought
the marijuana odor was coming from the glove compartment of the
car (a statement the government quickly corrected by asking:
"I'm sorry, I didn't hear you.  You thought it was where?"), and
his explanation for why he departed from his normal car-search
protocol and instead made straight for the center console[5] --
their collective weight is not such that I will find his
testimony not credible.

---

[5]In providing the reasoning behind his departure from the
norm, Officer Gately said that once he had removed Charley from
the car, pat-frisked him, and turned him over to the custody of
another officer, there was little chance he would be pulled into
the car by the remaining occupants.  He further explained, "I
figured there was enough officers if I got hurt then they'd help
me out."  Removing the driver of the car and having available
back-up on hand were reasonable precautions to take so as to
ensure safety during such a roadside investigation.  By contrast,
commencing the search of the interior of the car while three
passengers remained there -- one of whom was the man whose prior
arrest for a shooting was what had attracted the attention of the
police in the first place and any of whom might have reached
under a seat for a weapon -- is counterintuitive because it would
seem only to heighten the risk that harm might befall the
investigating officer.  Furthermore, the risk that the contraband
would be moved or destroyed would be reduced, not heightened, if
Officer Gately had removed the other passengers from the car
before beginning his search of its interior.
     It is not for the courts, however, to engage in Monday
morning quarterbacking.  Officer Gately -- who has been on the
Boston Police Department force for nine years and who, in the
course of his police work, has handled marijuana approximately a
thousand times and become familiar with the smell of unburnt
marijuana -- testified, under oath, that he smelled the odor of
unburnt marijuana coming from the center console before he
started his physical search of the interior of the car.  Although
the path of his logic regarding the aberrational search technique
he employed in this instance may in hindsight be subject to
questioning, without any compelling reason to discredit his
testimony, I accept it at face value.

Charley's position regarding Officer Gately's capacity to detect the odor of unburnt marijuana amidst the olfactory cacophony being played in the car is weakened significantly by the testimony of his own expert, Dr. Lawless. In response to questioning from the court, Dr. Lawless acknowledged that it would have been possible for a police officer with Officer Gately's level of experience to detect the smell of the unburnt marijuana through only the plastic bags and the material comprising the center console, and still possible, albeit less likely, to detect the smell with "relatively fresh" air fresheners and the odor of beer in the car.[6]

---

[6]The relevant testimony from the August 11, 2004 hearing is as follows:

> THE WITNESS: Are you asking me, your Honor, for an overall likelihood of detection?

> THE COURT: Yes. Whether or not under those circumstances knowing what you know on the basis of your experience in this general area but not specifically with marijuana, whether or not you feel comfortable giving an opinion to a reasonable degree of scientific certainty regarding the capacity of such a police officer, such as Officer Gately here today, under those circumstances, the marijuana has been in closed console, it is within eight bags, and has been within the car, presumably during a time period at least when the occupants were in the bar. I'm not asking you to talk about air freshener yet, I'm not asking you to talk about beer in the car yet, and I am asking you to consider that the car has made a U-turn for some distance but not a particularly significant distance.

> THE WITNESS: I think I can render an opinion.

> THE COURT: All right. Go ahead....

> THE WITNESS: I think it's possible for the officer to detect that smell, yes.

Charley's back-up argument that because Officer Gately was predisposed to think he smelled marijuana in the car, he thought he smelled it emanating from the inside of Charley's car but did not "actually" do so, similarly was undermined by Dr. Lawless' testimony.

> THE COURT: [A]m I correct that you're still saying that a person under those circumstances would as an objective matter smell marijuana?  Not that it's a construct that he expects to find marijuana, therefore, he smells something that he thinks is marijuana --
>
> THE WITNESS: I'm not saying he imagined it, no.

---------------

> ...
>
> THE COURT: Okay.  Would your opinion be the same if the air fresheners that you saw were in place and relatively fresh at the time in September of 2003?
>
> THE WITNESS: It would still be possible, but not likely.
>
> ...
>
> THE COURT: Okay.  And let's assume that there's been -- not the air fresheners but beer and their empty beer can and a partially filled beer bottle.
>
> THE WITNESS: That would decrease the likelihood further.
>
> THE COURT: Decrease the likelihood or in the absence of the air freshener cause you to say it is not likely that a police officer under those circumstances would be able to identify marijuana?
>
> THE WITNESS: Your Honor, as you saying no air fresheners but with the other factor --
>
> THE COURT: The other factor being beer.
>
> THE WITNESS: I can't say one way or the other about the more likely than not, but those factors would decrease the likelihood of detection.

Transcript of August 11, 2004 hearing at 66-70.

-15-

THE COURT: This is on some objective basis, some olfactory measurement, he smells what is marijuana.

THE WITNESS: If we can't see the source but we have an expectation of finding something there, we're better at detecting it.

THE COURT: Okay.  But the process is not merely imagining it.

THE WITNESS: No.

(Transcript of August 11, 2004 hearing at 70-71.)  In the face of these opinions, and in the absence of any significant impeachment evidence to undermine his version of events,[7] I find Officer Gately's testimony credible.  Accordingly, I find that the police had probable cause to search Charley's car, that the search and subsequent seizure did not violate the Fourth Amendment, and that the evidence obtained therefrom should not be suppressed.

## C.    Post-arrest Statements

Charley advances two theories to support the suppression

---

[7]Along with his claim that Officer Gately did not smell the marijuana due to the other competing odors in the car, during oral argument on September 8, 2004 Charley argued that: (1) the statements by the other occupants of the car that there was no perceptible odor of marijuana are reliable; and (2) the absence of any mention in the police report that someone other than Officer Gately smelled the marijuana is telling.  Neither of these theories is particularly compelling.  First, I have not been persuaded of the veracity of the statements made by the three other occupants of the car to the effect that there was no odor of marijuana in the car.  For reasons including their own exposure to criminal prosecution and their loyalty to Charley, all three passengers had the motivation to deny having smelled marijuana in the car.  Second, there is no legal requirement that Officer Gately obtain corroboration from one of his colleagues regarding his sensory perception.  Once he smelled the odor of unburnt marijuana coming from inside the car, he had the requisite probable cause to conduct a warrantless search of the vehicle.

from evidence of his post-arrest statements.[8]  First, Charley
argues that the statements were obtained via psychological
coercion -- namely, the police proposing a "deal" to Charley
whereby his brother and friends would be released from custody if
he admitted that the gun found in the car was his -- are
therefore involuntary, and must be suppressed pursuant to the
Fifth Amendment.  Second, Charley maintains that he made the
statements as the police impermissibly continued to question him
after he had invoked his right to counsel, thereby infringing
upon his Miranda rights, and coerced him into waiving his right
to counsel by suggesting that the aforementioned "deal" would
expire should he take the time necessary to obtain legal counsel
before deciding upon it.  The facts of this case do not support
suppression based on either of these arguments, which I will
consider in turn.

    1.  Voluntariness - It is reasonable, and even likely, that
the calculus Charley undertook in deciding to admit ownership of
the gun during his post-arrest custodial interview was influenced
by the comments made by the police regarding the situation facing
his three compatriots.  That these informational inputs affected

---

[8]Charley also contends that his post-arrests statements were
the fruits of an illegal search and seizure, are therefore
tainted by these Fourth Amendment violations, and must be
suppressed on those grounds as the police have not demonstrated
"a sufficient break in events to undermine the inference that the
confession was caused by the Fourth Amendment violation."  Oregon
v. Elstad, 470 U.S. 298, 306 (1985).  Having found that the
search and seizure were not in violation of the Fourth Amendment,
I need not address this alternate line of argument.

Charley's decision-making process and thereby, in some sense, his capacity to make an independent decision does not necessarily render his statements coerced and involuntary. "Free choice" in some expansive sense is not the determinative factor in the involuntariness analysis; it is the "absence of police overreaching" which is.[9] <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986) (finding admissible a confession volunteered by a suspect while in a state of psychosis that interfered with his ability to make "free and rational choices"). For it is "coercive police activity" that is the "necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Id.</u>, 479 U.S. at 167; <u>see also</u> <u>United States v. Genao</u>, 281 F.3d 305, 310 (1st Cir. 2002) (finding admissible and non-coerced a confession made when defendant was in police custody in an apartment with a "sizable team" of police officers and a police dog present); <u>United States</u>

---

[9] In arguing that confessions are admissible only if they are free and voluntary, Charley cites <u>Bram v. United States</u>, 168 U.S. 532 (1897), for the proposition that voluntary confessions are those "not [] extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." <u>Id.</u> at 542-43. While <u>Bram</u> has not been directly overruled, it has been limited such that the voluntariness -- or, rather, the involuntariness -- inquiry does not turn entirely on whether the police made any promises or threats and, instead, must consider whether, in light of the totality of the circumstances, the will of the defendant was overborne. <u>See, e.g.</u>, <u>United States v. Byram</u>, 145 F.3d 405, 407-08 (1st Cir. 1998); <u>United States v. Jackson</u>, 918 F.2d 236, 241-42 (1st Cir. 1990); <u>Bryant v. Vose</u>, 785 F.2d 364, 367-68 (1st Cir. 1986).

v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (finding, in light of the narrowed definition of coercion in Connelly, that false assurance by police that defendant was not in danger of prosecution was not so coercive as to render defendant's statements involuntary and inadmissible).

Whether or not the police have engaged in "coercive activity" is not assessed in a vacuum, however, and necessarily considers the effect of the conduct by the police on the particular suspect.  After all, statements regarding consequences that might befall a family member depending on whether or not a suspect cooperated with the police would have a far different impact on a suspect with close family ties than on one estranged from his kin.  Thus, "the courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, including any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne."  United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) (emphasis in original).  A similar analytical approach must be applied here.

Charley does not argue that in order to obtain his admissions the police threatened him with violence or retaliation, or subjected him to undue or unusual pressure, all of which have been recognized as coercive tactics.  See, e.g., Bryam, 145 F.3d at 408; Genao, 281 F.3d at 310.  Instead, according to Charley, the coercive activity with which the police

-19-

prevailed over his will and thereby obtained his confession was proposing a deal to him pursuant to which they would not press charges against his brother and friends so long as he admitted that the gun found in his car belonged to him.  Charley maintains that "his repeated references to the deal throughout the interview clearly demonstrate the coercion exerted upon him by the interviewing officer" and he points to the fact that shortly before admitting ownership of the gun he stated, "Let's just get this over with, get them out of here."

There are situations in which the police have employed psychological coercion to leverage a suspect's concern for friends or family so as to overbear his will and thereby procure an involuntary confession.  See, e.g., Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (finding involuntary and coerced a confession made after police informed suspect -- who had no prior experience with the criminal justice system and "no reason not to believe that the police had ample power to carry out their threats" -- that state financial aid for her infant children would be cut off and her children taken from her if she did not cooperate with the police); United States v. Tingle, 658 F.2d 1332, 1335-36 (9th Cir. 1981) (finding confession involuntary when obtained by coercive statements by investigating federal agent to the effect that if defendant failed to cooperate she would not see her young child for an extended period of time). The circumstances of this case, however, do not support a finding

that Charley's will was overborne in this fashion, and are closer
to those in <u>Jackson</u>, 918 F.2d 236, where the court denied the
defendant's motion to suppress as involuntary and coerced via
psychological pressure admissions he made while being
interrogated by the police regarding the ownership of a gun found
in his car.

The defendant in <u>Jackson</u> argued that his admissions were
involuntary because they were made after the police informed him
that his sister had been arrested for a gun violation and then
made an implied "threat" or "promise" that she "might be caused
or spared harm, depending on whether or not [the suspect]
admitted ownership of the firearm." <u>Id.</u> at 242. In considering
the totality of the circumstances while assessing the
voluntariness of the defendant's admissions, the court noted that
there was no evidence of an "especially close relationship"
between the defendant and his sister, both of whom were adults,
or that the defendant was "unusually susceptible to psychological
coercion on [account of his relationship with his sister] or any
other, particularly in light of [his] very substantial previous
experience with the criminal justice system." <u>Id</u>. Based on
these factors, the court concluded that the defendant "did not
lose volitional control, nor was his will overborne." <u>Id.</u>

The totality of the circumstances in this case similarly do
not support a finding that the defendant's will was overborne by
the police. As in <u>Jackson</u>, there is no evidence that Charley was
either inordinately close to his brother (or to the two other

passengers in the car) or that he was "unusually susceptible" to psychological coercion on this basis or any other.  Additionally, like the defendant in Jackson and in contrast to those in Lynumn and Tingle, Charley is a convicted felon with some experience dealing with the criminal justice system.  Although, based on the record at hand, this factor may be of limited value -- Charley's prior experiences with the police could have involved coercive tactics, after all -- it is properly the subject of consideration when assessing, based on the totality of the circumstances, whether the defendant's will was overborne. More noteworthy is that in the course of the interrogation Charley continued to deny that he had made a U-turn on Huntington Avenue, claiming instead that he had been parked on same side of the street as Flanagan's (i.e., the side on which traffic was heading into downtown Boston and towards Tremont Street) all along.  Although the ostensible "deal" offered by the police did not depend upon whether Charley had made a U-turn, only on whether he admitted ownership of the gun, that Charley maintained a contrary position suggests that his will was not entirely overborne by the police during the interrogation.  The prosecution makes much of the fact that the police repeatedly informed Charley during the interrogation that they did not want him to confess untruthfully to ownership of the gun in order to "get the other three people off."  The tone of these self-conscious caveats suggests a deliberateness born of past negative experience and subsequent corrective training; standing alone

they would not preclude a finding of coercive police activity.
But in the context of the interrogation and the factors discussed
above, they too support a conclusion that the police did not
employ coercive tactics.  In sum, based on the record before me
and having in particular listened to tape recordings of the
several relevant interrogations by the police, including that of
Charley, I cannot find that the police were overbearing, that
Charley lost volitional control, or that he had his will
overborne by coercive police tactics such that his post-arrest
admissions were involuntary.  As a result, the statements will
not be suppressed on that ground.

        2.  <u>Compliance with Miranda</u> - I turn now to the second of
Charley's arguments regarding the suppression of his post-arrest
statements.  Charley claims his admissions were obtained by the
police only after he had invoked his right to counsel and that
the police unconstitutionally thwarted his attempted invocation
by making the above-discussed "deal" contingent upon his
accepting it immediately and not delaying in order to consult
with an attorney before deciding upon it.  Neither the record nor
the applicable case law support suppression on this basis.

        Among the "procedural safeguards" established by the Supreme
Court in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), to protect the
Constitutional right against compulsory self-incrimination was
that suspects being subjected to custodial interrogation by the
police have the right to consult with an attorney and to have an

attorney present with them during the questioning, and also that
the police must advise suspects of this right, among others,
before commencing interrogations.  Id. at 469-73.  It is
established beyond peradventure that when a person in police
custody unambiguously invokes his right to counsel, "he 'is not
subject to further interrogation by the authorities . . . unless
the accused himself initiates further communication, exchanges,
or conversations with the police.'"  James v. Marshall, 322 F.3d
103, 108 (1st Cir. 2003) (quoting Edwards v. Arizona, 451 U.S.
477, 484-85 (1981)).

    Charley argues that the precedent established by an
unpublished First Circuit decision pursuant to which when a
defendant makes an "equivocal or ambiguous expression of a
present right to counsel, the questioning officers must find out
more specifically whether he wants a lawyer before they can
proceed with other questioning," Sundstrom v. Powell, 960 F.2d
143, 1992 WL 82473, at **6 (1st Cir. Apr. 23, 1992) (internal
citations omitted), still applies because the holding by the
Supreme Court in an intervening decision, Davis v. United States,
512 U.S. 452 (1994), that the police are not required to cease
questioning under such circumstances was merely dicta.  The
language of the Davis decision rebuts this contention:

> To recapitulate: We held in Miranda that a suspect is
> entitled to the assistance of counsel during custodial
> interrogation even though the Constitution does not provide
> for such assistance.  We held in Edwards that if the suspect
> invokes the right to counsel at any time, the police must

> immediately cease questioning him until an attorney is
> present. But we are unwilling to create a third layer of
> prophylaxis to prevent police questioning when the suspect
> <u>might</u> want a lawyer. Unless the suspect actually requests
> an attorney, questioning may continue.

<u>Id.</u> at 462 (emphasis in original). The <u>Davis</u> Court noted that

while it would be "good police practice" for police officers to

ask clarifying questions to determine whether or not a suspect

actually wants an attorney, they were under no affirmative

obligation to do so. <u>Id.</u> at 461-62.

Charley admits that his invocation of his right to counsel

during the September 28, 2003 police interrogation was an

equivocal one. Based on the Supreme Court ruling in <u>Davis</u>, I

find that the officers questioning Charley were not obliged to

ask him any further questions to clarify this ambiguous

invocation and were free to continue with the interrogation. I

decline the invitation by Charley to find the <u>Davis</u> holding in

this regard inapplicable dicta[10] and apply the First Circuit rule

_____

[10]In fact, under First Circuit precedent, lower courts may
be bound by the "considered dicta" of the Supreme Court. <u>See</u>
<u>Rossiter v. Potter</u>, 357 F.3d 26, 31 (1st Cir. 2004) (citing <u>McCoy</u>
<u>v. MIT</u>, 950 F.2d 13, 19 (1st Cir. 1991) for the proposition that
"federal appellate courts are bound by the Supreme Court's
considered dicta almost as firmly as by the Court's outright
holdings particularly when . . . a dictum is of recent vintage
and not enfeebled by any subsequent statement"). The dictum at
issue in <u>McCoy</u> -- and found to be the product of "careful
consideration" as opposed to "casually constructed" -- was the
text of a footnote to the High Court's decision. <u>See</u> <u>McCoy</u>, 950
F.3d at 19. The indicia of "careful consideration" are even more
manifest in the text of the <u>Davis</u> decision now under debate. The
relevant language concludes several pages of discussion regarding
the Court's holdings on the right to counsel, the invocation of
the right, and the relation of the same to limits on police
questioning of suspects. The language is set off by a colon

articulated in Sundstrom instead.  Accordingly, the post-arrest
statements made by Charley will not be suppressed on the grounds
that the police failed to resolve his ambiguous invocation of his
right to counsel.

Appreciating that I might be reluctant to look past the
instructions of Davis regarding the obligations of police when
confronted with ambiguous invocations of the right to counsel,
Charley further argues that the police interrogating him did ask
clarifying questions regarding his equivocal invocation, but that
the questions were designed to coerce him into waiving his right
to counsel.  To support this claim, Charley points to the
supposedly time-limited nature of the "deal" the police had
placed before him -- that his friends and brother would be
released if he admitted that the gun found in his car belonged to
him, but that this offer would not stay on the table long enough
for Charley to obtain a lawyer before deciding on it.[11]  Charley
hangs his argument on this issue on only one explicit statement,
an interrupted one at that, made by the interrogating officer:

---

following the words "To recapitulate."  The Supreme Court took
pains to summarize in explicit terms its holding on this issue
and its determination not to extend Edwards to require the police
to halt questioning in the face of an ambiguous or equivocal
invocation.  With such clear guidance -- and absent any
contradictory subsequent statement by the Court on this matter --
the dicta in Davis appears to be binding.

[11]For the reasons discussed in greater detail above, I find
that the back-and-forth between the police and Charley regarding
what would happen to his fellow passengers should he admit
ownership of the gun was not coercive.

"I'm just telling you right now we're offering you --."  A close review of the transcript and tape recording of the interrogation does not support a finding that the "deal" being offered to Charley by the police was a time-limited one that would be withdrawn should he exercise his right to counsel, which would have been an unconstitutional attempt to pressure him to waive his right to counsel.

In support of his position on this issue, Charley cites United States v. Anderson, 929 F.2d 96 (2d Cir. 1991), in which the court suppressed a confession on the grounds that it was coerced by the investigating agent who, after providing the suspect with valid Miranda warnings, told him three times that if he asked for a lawyer he would be permanently precluded from cooperating with the police.  The conduct found coercive in Anderson is a far cry from what is presented in the record before me.  Only a strained reading of the interrogation transcript -- in effect, interpreting the words "right now" in the above-quoted statement to be indicative of a material, albeit nowhere else mentioned, term of the much-discussed "deal" -- would support a finding that the police presented Charley with an impermissible cooperate-or-counsel Hobson's choice.  I will not subject the facts to the contortions necessary to reach this conclusion and, accordingly, I find that the police did not coerce Charley into not exercising his right to counsel.  The plain implication of the comment, which I adopt, was that given the hour of the day, arranging for appointed counsel would take time.  This was both

an accurate observation and also not improperly coercive.

For the foregoing reasons, the post-arrest statements made by Charley will not be suppressed.

### III. CONCLUSION

For the reasons set forth more fully above, the defendant's motion to suppress is DENIED.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE